# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 22-00105-01-CR-W-HFS |
| JEREMY ACE WOODS, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### I.  INTRODUCTION

The United States, by and through its undersigned counsel, hereby respectfully submits its Sentencing Memorandum in anticipation of sentencing, scheduled for September 20, 2023, at 9:30 a.m., before Senior United States District Judge Howard F. Sachs. Applying the factors outlined in 18 U.S.C. § 3553(a), the United States recommends a sentence of 210 months—a sentence within the applicable Guidelines range—followed by a three-year term of supervised release.

### II.  BACKGROUND

On December 14, 2022, the defendant, Jeremy Woods, pleaded guilty to a five-count Superseding Information, charging three counts of travel fraud, in violation of 18 U.S.C. § 2314, and two counts of wire fraud, in violation of 18 USC § 1343. (PSR ¶ 1.) Specifically, the defendant pled guilty to executing a rental-equipment scheme and real-estate scheme. (*Id.*) As part of the rental-equipment scheme, the defendant stole approximately 96 pieces of rental equipment and then sold much of the equipment to unsuspecting victim buyers; as part of the real-estate scheme, the defendant fraudulently sold 12 homes he did not own, extracting large downpayments and

monthly installment payments from unsuspecting victim buyers. (PSR ¶¶ 3-76.) The defendant has made his livelihood breaking the law and has 31 prior felony convictions. (PSR ¶¶ 91, 97-144.)

### III.     SENTENCING RECOMMENDATION

#### A.     Guidelines Calculation

The United States agrees with the PSR that the applicable Guidelines range is 168-210 months. (PSR ¶ 199.)

#### B.     Objections to the Presentence Investigation Report

The defendant has made several objections to the PSR in this case. (PSR, Addendum 1.) After discussions with defense counsel, the defendant's objections have been narrowed into the four below-outlined objections.

##### 1. Applicability of the Sophisticated Means Enhancement (Two-Level Enhancement)

The defendant objects to the PSR's inclusion of the two-level enhancement for sophisticated means under § 2B1.1(b)(10)(C). (PSR ¶ 86.) Based on the uncontested facts in the PSR and Eighth Circuit precedent, this two-level enhancement applies, and the defendant's objection should be overruled.

"The enhancement applies when the offense conduct, viewed as a whole, [is] notably more intricate than that of the garden-variety offense." *United States v. Boarders*, 829 F.3d 558, 570 (8th Cir. 2016) (cleaned up). When applying the enhancement, "[e]ven if any single step [of the scheme] is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." *United States v. Houston*, 744 F.3d 589, 592 (8th Cir. 2014) (quotation omitted) (finding, in part, a sophisticated scheme when defendant used "straw buyers"); *see also Boarders*, 829 F.3d at 570 (finding, in part, a sophisticated scheme where a conspiracy to steal stolen vehicles lasted

2

"four years, involve[ed] six trucks, fifteen trailers, and thousands of dollars in cargo"). Simply put, "sophisticated means need not be highly sophisticated." *United States v. Norwood*, 774 F.3d 476, 480 (8th Cir. 2014) (cleaned up) (collecting cases) (finding, in part, a sophisticated scheme where the "scheme involved [defendant] recruiting others as to avoid detection").

Here, specific to the equipment scheme, the defendant used aliases and additional lies to enter into sexual relationships with women and employment relationships with men. (PSR ¶¶ 4-26.) The defendant then used these relationships as a platform to have these individuals unwittingly act as straw renters of the relevant equipment—using their real names and banking information to obtain the equipment. (*Id.*) In at least two instances, Woods had individuals set up bank accounts, in their name, to rent the relevant equipment. (PSR ¶¶ 4, 21.)

Once the rental equipment was obtained, the defendant—again, using various aliases—lined up buyers for the stolen equipment by posting the equipment for sale on Facebook Marketplace or similar websites. (*See* PSR ¶¶ 5, 13, 14.) As such, this was a multi-level, coordinated, and repetitive fraud that left three-layers of victims in its wake—the straw renters, the rental companies, and the unsuspecting buyers. In total, from February 16, 2017, to November 3, 2021, the defendant used at least four aliases (PSR ¶¶ 4, 9, 14, 23); used five straw renters (PSR ¶¶ 4-26, 34-35); stole 96 individual pieces of equipment from 25 separate rental companies (PSR ¶ 41); and fraudulently collected $188,100 from 15 victim buyers (PSR ¶ 42).

In the real-estate scheme, the defendant used his companies—Ace's Remediation and Lawn Service and Vaughn's Property Management—to obtain maintenance contracts in order to gain access to the relevant properties. (PSR ¶ 43.) The defendant then entered into fraudulent sales of the homes, eliciting large downpayments and having the victims sign contracts requiring them to make monthly installment payments. (PSR ¶ 45-71.) Here, the defendant used aliases with each

victim (PSR ¶¶ 45, 49, 53, 55, 57, 60, 63, 66, 68, 70.) and repeatedly requested that payments be made in cash to operate outside of the banking system. (PSR ¶¶ 49, 55, 60, 68.) This scheme was also coordinated and repetitive, involving approximately 12 properties. (PSR ¶¶ 45-71.)

Based on the undisputed facts in the PSR—including the duration and repetitive-nature of the schemes as well as the fact that, at multiple stages during the schemes, the defendant took measures to avoid detection, including the use of aliases, use of unwitting straw renters, and the purposeful operation outside of the banking system—the United States believes that each scheme was, in fact, "more intricate than that of the garden-variety offense." *Boarders*, 829 F.3d at 570 (citation omitted). For these reasons, the defendant's objection should be overruled.

**2. The Use of Intended or Actual Loss to Calculate the Guidelines Range**

While the parties agree that the intended loss and actual loss are calculated correctly, the defendant objects to the intended loss being used to calculate his Guidelines range. (PSR, Addendum 1.) With an agreed-upon intended loss of $2,229,177.48 and an agreed-upon actual loss of $900,896.76, this Court's ruling on the defendant's objection could adjust the defendant's offense level by two levels. (PSR ¶ 76; *see also* U.S.S.G. § 2B1.1(b)(1)(H)-(I).) Based on the Guidelines commentary and Eighth Circuit precedent, this Court should use the intended loss to calculate the Guidelines, and the defendant's objection should be overruled.

"Under the Sentencing Guidelines, the offense level for fraud depends on the greater of the actual or intended losses, the latter of which includes any pecuniary harm that the defendant purposely sought to inflict even if it would have been impossible or unlikely to occur." *United States v. Karie*, 976 F.3d 800, 804 (8th Cir. 2020) (*quoting* U.S.S.G. § 2B1.1 cmt. n. 3(A)) (cleaned up); *see also United States v. Kidd*, 963 F.3d 742, 753 (8th Cir. 2020) (finding, in an insurance

4

fraud case, that the actual loss to insurers was $991,530, the intended loss was $2,001,000, and the "guidelines count the larger amount").

For the rental-equipment scheme, the intended loss was calculated by adding the value of the stolen rental equipment, $999,077.48, to the amount the victim buyers paid the defendant, $188,100, for a total of $1,187,177.48. (PSR ¶ 42.) This total was then added to the intended loss for the real-estate scheme, which was calculated by adding the amount paid by the victims for the downpayments, home upgrades, and/or monthly installment payments with the total unpaid amount owed under the fraudulent contracts for a total of $1,042,000. (PSR ¶ 74.) Therefore, the intended loss for both schemes is $2,229,177.48. (PSR ¶ 76.) *See United States v. Harmon*, 944 F.3d 734, 738 (8th Cir. 2019) (finding "the district court need only make a reasonable estimate of loss rather than a precise determination" (citation omitted)); *United States v. Ware*, 334 Fed.Appx. 49, 50 (8th Cir. 2009) (finding that actual and intended loss are not "mutually exclusive categories" and "[t]here is nothing in the word 'intended' or in the application notes [of § 2B1.1] that suggests that completed intentional losses should not be included" in the intended loss calculation).

Here, the intended loss is greater than the actual loss. Therefore, under the Guidelines and Eighth Circuit precedent, the intended loss should be used to calculate the defendant's sentencing range, and the defendant's objection should be overruled.

### 3. Restitution Objection

In the PSR, the defendant objects to the restitution amounts in this case. After further discussion with defense counsel, however, this objection has been narrowed. Specifically, the defendant currently has restitution orders in five separate state cases, and—understandably—the defendant objects to any restitution being ordered in this case which has already been ordered in one of his state cases. As outlined below, the United States and Probation Office have worked to

ensure the restitution amounts contained the PSR have been properly adjusted to account for the defendant's outstanding state restitution orders. (PSR ¶ 212.)

In Cass County, Missouri—in case number 18CA-CR00224-01—the defendant was convicted of being an accessory to stealing leased or rented property. (PSR ¶ 137.) As part of his sentence, the defendant was ordered to pay $26,893.75 in restitution to Rusty Gerken. The conduct in the state case was incorporated as relevant conduct in this case, so the Gerken Rent All restitution amount has been reduced to account for the state restitution order. (PSR Addendum 2.)

In Platte County, Missouri—in case number 17AE-CR01161-01—the defendant was convicted of stealing leased or rented property. (PSR ¶ 138.) As part of his sentence, the defendant was ordered to pay $6,500 in restitution to Platte Rental and Supply. The conduct in the state case was incorporated as relevant conduct in this case, so Platte Rental and Supply's restitution amount has been reduced to account for the state restitution order. (PSR Addendum 2.)

In Lyon County, Kansas—in case number 2017CR0362—the defendant was convicted of theft. (PSR ¶ 139.) As part of his sentence, the defendant was ordered to pay $4,274.94 in restitution to All-Star Rental. The conduct in the state case was incorporated as relevant conduct in this case, so the All-Star Rental restitution amount has been reduced to account for the state restitution order. (PSR Addendum 2.)

In Carroll County, Missouri—in case number 19CR-CR00121-01—the defendant was convicted of three counts of stealing leased or rented property. (PSR ¶ 142.) As part of his sentence, the defendant was ordered to pay $1,463.48 in restitution to Woodshed Lumber. The conduct in the state case was incorporated as relevant conduct in this case, so Woodshed Lumber's federal restitution amount has been reduced to account for the state restitution order. (PSR Addendum 2.)

Finally, in Montgomery County, Kansas—in case number 2020CR0344—the defendant was convicted of two counts of theft. (PSR ¶ 143.) As part of his sentence, the defendant was ordered to pay $4,000 to Woods Lumber Company. The conduct in the state case was incorporated as relevant conduct in this case, so Woods Lumber Company's restitution amount has been reduced to account for the state restitution order. (PSR Addendum 2.)[1]

Based on conversations between the parties, the United States believes that the above-outlined restitution adjustments—which are already represented in the PSR—should resolve the defendant's objection.

Additionally, the United States provides that the restitution amounts in this case are based on the reported value of the unrecovered rental equipment as well as the actual loss of United States currency by individual victims. As such, the restitution amounts do not rely on estimates, but rather on concrete property losses compensable under 18 U.S.C. § 3663A. Finally, the uncontested facts in the PSR clearly provide the information necessary to determine restitution amounts for the financial victims in this case. As such, determining restitution amounts in this case is not "impracticable" and will not unreasonably "complicate or prolong the sentencing process." 18 U.S.C. § 3663A(c)(3).

### 4. Vulnerable Victim Enhancement (Two-Level Enhancement)

In the PSR, the defendant objects to the vulnerable-victim enhancement under § 3A1.1(b). (PSR ¶ 87.) According to defense counsel, this objection will be withdrawn at the sentencing hearing.

---

[1] Please note, for U.S.S.G. § 5G1.3 purposes (*see* PSR ¶ 200), it appears the defendant has only served approximately 21 days in custody on the five above-outlined cases. (*See* PSR ¶¶ 137-139, 142.)

### C. Recommended Sentence of Imprisonment and Supervised Release

In accordance with the sentencing factors outlined in 18 U.S.C. § 3553(a)(1) and (2), the United States recommends this Court impose a sentence of 210 months—a sentence within the defendant's applicable Guidelines range—followed by a three-year term of supervised release.[2] The United States also requests this Court order restitution for the victims consistent with the amount contained in the PSR. (PSR Addendum 2.) Finally, the United States requests the Court finalize the Preliminary Order of Forfeiture. (*See* D.E. 32.)[3]

#### 1. Nature and Circumstances of the Offense

Jeremy Woods devised and executed two brazen and highly profitable fraudulent schemes. These schemes upended numerous lives and resulted in approximately 48 financial victims, an actual loss of $900,896.76, and an intended loss of $2,229,177.48.

*Rental-Equipment Scheme*

The rental-equipment scheme was a triple-layer fraud, creating three distinct categories of victims—the straw renters, the rental companies, and the unsuspecting buyers. To execute the scheme, the defendant—while using various aliases—entered into sexual relationships with multiple women and entered into employment relationships with multiple men. (PSR ¶¶ 4-27.) The defendant exploited these relationships by asking the individuals—under false pretenses—to

---

[2] To arrive at a total sentence of 210 months, the United States recommends a sentence of 120 months for Counts One, Two, and Three and a sentence of 210 months for Counts Four and Five with all counts running concurrent to each other.

[3] Pursuant to the terms of the Plea Agreement, the United States request the Court finalize $336,150 as the forfeiture amount in this case. This amount encompasses the proceeds the defendant personally received from the charged conduct in this case. Since entry of the Preliminary Order of Forfeiture, the United States has not received any assets or payment from the defendant. As such, $336,150 is still the correct forfeiture amount.

rent equipment for him, using numerous lies as to why he could not rent the equipment himself. (PSR ¶¶ 4, 7, 9, 11-12, 19, 21.)

After renting the equipment—using their names and banking information—the straw renters generally dropped the equipment off at one of the defendant's storage units. (PSR ¶¶ 4, 9.) The defendant then—again, while using various aliases—posted the rental equipment for sale on Facebook Marketplace or similar websites and sold the equipment to unsuspecting individuals who were unaware they were purchasing stolen property. (PSR ¶¶ 4-27.) When the rental companies contacted the straw renters asking why the equipment had not been returned, the defendant would again provide various lies to cover up his illegal activity. (PSR ¶¶ 7, 19, 21.)

All told, from February 16, 2017, to November 11, 2021, the defendant stole 96 individual pieces of equipment—valued at approximately $999,077.48—from 25 separate rental companies. (PSR ¶ 41.) Once in his possession, the defendant sold at least 41 pieces of equipment to at least 15 victim buyers from across the Midwest, including buyers from Missouri, Kansas, Nebraska, Iowa, Illinois, Oklahoma, and Arkansas. (PSR ¶ 15, 33, 40, 41.) These victim buyers paid the defendant a total of $188,100 for the stolen equipment. (PSR ¶ 41.)

Through this scheme, the unwitting straw renters suffered damage to their credit scores and suffered financial losses; the victim rental companies suffered financial losses; and the victim buyers—many of whom were small business owners—sustained devastating financial losses when the equipment they purchased was ultimately returned to the appropriate rental companies. (PSR ¶ 41, 212, Addendum 2.)

Simply put, this fraud directly targeted hardworking small business owners as well as the rental businesses that support them. According to the victim declarations, this fraud had a direct impact on multiple victims' financial solvency and caused substantial loss of retirement, education,

9

or other savings. One victim buyer said it best when—on his victim declaration form—he simply stated, "I lost money from my saving[s] . . . [t]hat I worked hard to obtain."

*Real-Estate Scheme*

The defendant's real-estate scheme was a brazen fraud that left a trail of financial devastation in its wake. (PSR ¶¶ 43-75.) Specifically, from September 2021 to February 2022, the defendant sought and received contracts to perform maintenance on homes going through the foreclosure process, including numerous properties owned by the United States Department of Housing and Urban Development. (PSR ¶ 43.) After receiving the maintenance contracts and gaining access to the homes, the defendant—instead of honoring the contracts and performing the agreed-upon work—posed as the owner of a real-estate company and fraudulently sold the homes to unsuspecting victim buyers. (*Id.*)

Specifically, Woods—while using multiple aliases—elicited large downpayments from the victims and had the victims enter fraudulent contracts, requiring them to make monthly installment payments until the homes were paid in full. (PSR ¶ 45-71.) To further perpetrate the fraud, Woods would ask the victim buyers to refer his services to their family and friends, even offering one victim $3,500 off his next home purchase to recommend his services. (PSR ¶ 47.) This word-of-mouth advertising led to the defendant victimizing 13 people through the fraudulent sale of 12 separate homes. (PSR ¶¶ 45-65, 68-71.[4])

All told, as part of the real-estate scheme, the defendant fraudulently elicited $183,000 in downpayments and monthly installment payments from the victims. (PSR ¶ 74.) Additionally, the

---

[4] Please note the defendant attempted to victimize two additional individuals but the fraud was discovered before a downpayment was made. (PSR ¶ 66.)

victims also spent approximately $33,777.18 to remodel the homes, leading to a total actual loss of $216,777.18. (*Id.*)

According to the victim declarations, this fraud—like the rental-equipment scheme—had a devastating financial impact on numerous lives. According to the declaration forms, this fraud had a direct impact on multiple victims' solvency; has caused substantial loss of retirement, education, or other savings; has caused substantial changes to employment and/or living arrangements; and has impacted victims' ability to obtain credit.

**2. History and Characteristics of the Defendant**

*Criminal History*

Simply put, the defendant has been on a 27-year crime spree. (PSR ¶¶ 97-144.) Specifically, since 1996, the defendant has been convicted of 31 felonies, 25 misdemeanors, and has had his probation or parole revoked 15 times. (*Id.*) The defendant also has pending cases in four separate counties, including an active warrant out of Lyon County, Kansas, for escaping from custody. (PSR ¶¶ 149-152.) Worst yet, when arrested in this case, in May 2022, the defendant was on felony probation in four separate cases in four separate Missouri counties and was on misdemeanor probation in Montgomery County, Kansas. (PSR ¶¶ 135, 137-138, 142-143.) This prior conduct has resulted in a criminal history score of 33, a score that is well off the Guidelines sentencing chart.

The defendant has a history of victimizing family members. In one instance, in *State of Missouri v. Jeremy Woods*, 16CR97006876, the defendant was convicted of forgery after he stole his grandparents' checkbook and forged a check to buy furniture. (PSR ¶ 100.) When contacted by law enforcement, the defendant's grandparents advised that the defendant had previously stolen checks from them and that his actions had required closure of a bank account. (*Id.*)

11

The defendant has also victimized at least one vulnerable individual. As part of the relevant conduct in this case, the defendant victimized K.G., a woman with an intellectual disability. (PSR ¶ 27.) After starting a sexual relationship with K.G., the defendant had K.G. rent or purchase multiple items on his behalf, including, but not limited to, a truck, trailer, and multiple cell phones. (PSR ¶ 27, 29.) Additionally, the defendant told K.G. that they were going to get married, and—based on those lies—used her money to purchase a $3,500 ring for himself. (PSR ¶ 27.) While K.G. only has out-of-pocket losses for the $3,500 ring purchase, her credit has been severely damaged by the defendant's actions. (PSR, Addendum 2.)

*Work History*

The defendant's work history is unverified. The defendant reported to the Probation Office that, from 2000 to 2021, he worked "off and on" for his grandfather's business, performing lawn care, doing demolition work, and cleaning up various properties. (PSR ¶ 195.) After the defendant's grandfather passed away, the defendant took over the business and, as provided in the PSR, used the business as a platform to commit the fraudulent schemes in this case. (*Id.*)

*Acceptance of Responsibility*

Immediately after being indicted for the rental-equipment scheme, the defendant—to his credit—hired counsel, authorized his counsel to meet with the government, and ultimately agreed to pled guilty to a Superseding Information charging both the rental-equipment scheme and real-estate scheme. These substantial actions by the defendant allowed the government to save substantial time and resources. As such, the defendant has received a three-level reduction in his Guidelines offense level, and the United States hereby respectfully requests the Court accept the three-level reduction. (PSR ¶¶ 92-93.)

3. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence to Criminal Conduct, and Protect the Public.**

For the past 27 years, this defendant has made his livelihood victimizing people. In this case alone, the defendant devised and executed two brazen and profitable fraudulent schemes, leading to the victimization of at least 48 people. The ramifications of these schemes will be felt for years in the form of damaged credit scores, loss of business profits, loss of personal savings, and—according to the victim declarations—financial insolvency.

The charged schemes are even worse when viewed in light of the defendant's criminal history. Specifically, while committing the crimes in this case, the defendant had 31 prior felony convictions; 25 prior misdemeanor convictions; and was on active probation in five separate cases in five separate jurisdictions.

The defendant's criminal history is full of cases where he was given probation or light prison sentences. Simply put, these sentences have not protected the public. After each of the defendant's 31 felony convictions, he committed more crimes and victimized more people. As such, the defendant has shown—through his own repeated actions—that to adequately protect the public, he needs to be incarcerated for a substantial period of time.

For these reasons, the United States believes a sentence of 210 months—a sentence within the applicable Guidelines range—will reflect the seriousness of the offenses in this case, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.

4. **Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner**

The defendant has an unverified work history, and when arrested in this case, he was struggling with addiction issues. Therefore, while a substantial prison sentence is necessary to

13

accomplish the above-outlined goals—including protection of the public—such a sentence is also necessary to provide the defendant with the opportunity to participate in educational programs, treatment programs, and vocational training so he can contribute to society when he is released from prison.

## IV. CONCLUSION

For the above-stated reasons, and after consideration of the 18 U.S.C. § 3553(a)(1) and (2) factors, the United States respectfully recommends this Court impose a sentence of 210 months—a sentence within the applicable Guidelines range—followed by a three-year term of supervised release. The United States also requests the Court order restitution for the victims consistent with the amounts outlined in the PSR (PSR ¶ 212, Addendum 2) as well as finalize the Preliminary Order of Forfeiture (D.E. 32).

Respectfully submitted,

Teresa A. Moore
United States Attorney

By: */s/ Nicholas P. Heberle*

Nicholas P. Heberle
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 E. 9th Street, Suite 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

**<u>CERTIFICATE OF SERVICE</u>**

   The undersigned hereby certifies that a copy of the foregoing was delivered on September 15, 2023, to the CM-ECF system of the United States District Court for the Western District of Missouri, for electronic delivery to all counsel of record.

                */s/ Nicholas P. Heberle*

                Nicholas P. Heberle
                Assistant United States Attorney